Good morning, Your Honors. Scott Quinlan for the appellants Carol Dela Torre and Maria Morales-Opeth. I have a couple of questions. When I read the briefs, I wondered, where are the indictments? Did it turn out that the government had nothing to charge anybody with? But then we got this letter, and apparently they have been charged with crimes. And the other thing, when I read the briefs, I thought, why are we entertaining an appeal when the case isn't over? But it looks like there's law that's right in point that says there's no 1983 suit if the suit would imply the invalidity of a conviction in a pending criminal action, just a straightforward application of Heck v. Humphrey. I'd like to. So for all kinds of reasons, I don't understand how we can do anything. Okay. In the first place, Maria Morales-Opeth. These are two separate cases. They were filed separately. Originally the ---- What do you mean by these? This appeal is of two separate cases. Is there a material difference? Is one charged and the other not? Exactly. Yes. Maria is not charged with anything. She was just a roommate. And the original ---- to give you some background on this issue, the original complaint was filed 18 months after we filed our action on May 25th, 2004. And then as we were getting up towards the preliminary hearing, the government convened a grand jury in May of 2005, and they filed an indictment against Carol, which ---- Carol. That's De La Torre? Carol De La Torre. So is she out under Harvey v. Waldron? Do we have to dismiss? I'd like to address that in just a second. Let me finish with telling you where we're at here. The short answer to that is I submit no. The Heck v. Humphrey and the Ninth Circuit authority applies to civil actions that are filed when there is a currently then-pending criminal case. And in fact, the Ninth Circuit has extended the original Supreme Court decision by applying it to pending cases, not cases in which a conviction has resulted. Are you trying to tell us that if you file it before your client is charged, you defeat the whole principle? No. What I'm saying is, is that the defendants should have set it up as an affirmative defense and then moved to abate. Instead of doing that, after the criminal case was filed, they made a motion to consolidate the two cases, which was ---- they made the motion on August 30, 2004, about three months after the criminal case against me was filed. That motion was granted over my objection. Then we get around to 2005, and in March of 2005, we enter a stipulation, the defendants and the plaintiffs, that Carroll's 2004 appeal, what had happened there is that the Court had granted an interlocutory appeal for Carroll, denied it as to Maria on this issue of amendment of the complaint. We stipulated, and it's filed with the trial court, that whatever happened in Carroll's appeal would apply to Maria's appeal, and therefore, we didn't have to raise it in this case. So we, the plaintiffs, both of them, have detrimentally relied upon the representations and the position taken by the defendants, which would not have been taken had they sought to assert what they're now asserting to you, this Heck v. Humphrey, in this Court. You've got to back up to something. I don't think I understood it. Sure. You stipulated that whatever happened in one case would happen in the other. The cases would stand or fall together? We stipulated, because only Carroll's interlocutory appeal on the motion to amend had been granted, that whatever happened on that appeal for Carroll would apply equally to Maria's case, and that's contained in Maria's case's 026626, and its docket number document 214 is that stipulation. And this occurred on March 2005, about ten months after the criminal complaint was filed. So what's happening here is that the defendant is taking action and causing us to take action as if they're not going to assert Heck v. Humphrey. I could have filed separate appeals. These are separate cases with separate case numbers. I could have filed a separate appeal of the matters today just as easily as filing them in one brief, and I called up the court clerk to make sure I could file it as one brief. And it wouldn't have affected Maria's case one whit. And so I'm saying that, basically, the government -- excuse me. The defendants can set this up as an affirmative defense below, and they can make allegations in connection with that pleading that the criminal case, the civil case with Carroll would affect the criminal case. If they believe that, that will be a tactical decision for them to make when this case goes back down. But to allow them to do this now, I think that they are stopped by their conduct. They have caused us to rely upon it. Let me get to a couple other issues before your time runs out. I don't understand why we're handling an interlocutory appeal. Only on the district court said we could. That doesn't mean we have to. And under GCC, we turn one of them down. It's only the interlocutory part of it is only on the motion to amend to add Assistant Chief Chavez and Commanders Liu and Commander Sumai, excuse me, to the complaint. That was held time-barred by the district court. Yes. And I cited -- You're saying it wasn't because it was two years. Exactly. And I'm saying that they didn't consider California Supreme Court precedent right on point. Is the State of California a defendant in this case? No. Just the county. Yes or no? No. No? No. The county first. Just the county? And the individual investigators, yes. Now tell me one more thing that I don't understand. What was the matter with issuing the search warrant or with the breadth of it? It looked like I read the affidavit, and it looked like they had a lot of evidence that these women were stealing from the charity, and they issued a search warrant so that they could find all the books and papers and evidences of expenditures that would tend to bear on whether that was true. Why is it defective? Okay. Carroll, according to the search warrant affidavit, and it's the depositions, Carroll handles the FFA, the Foster Family Agency part of it. They certify foster families, provide support to them, make sure they're doing what they're supposed to be doing, place kids with them. She didn't have anything to do with the group home part of the genesis. The affiant Seigler has stated that her probable cause analysis pertained to the group homes, not to the Foster Family Agency. What they did here was they were aware that genesis was involved in several businesses, the group homes, foster family agency, medical and alcohol treatment and counseling, and adoptions. Of all of those, the only one that they were interested in investigating was the group homes. The affiant knew that. She didn't tell anybody that. And she then proceeded to obtain a search warrant for everything, going back to the inception of genesis, which was 1988, for all manner of documents. They weren't just interested in the American Express credit cards, and they weren't just interested in credit cards from my clients. They sought everybody's credit cards that they could possibly find. I don't really understand the distinction you drew. It sounds like all three people are spending a whole lot more than their salaries, or any possible salaries would explain. And it looks as though a lot of money is being looted from the charity. And why not look? Well. Why limit it to one credit card or something like that? Okay. Ten days before the warrant was applied for, they talked to Dwayne Anderson, an auditor with the Department of Social Services, and he told them that you the information that you have does not establish a possibility of wrongdoing. There it is. My time's run out. But there is a smoking gun in this case. It's at ER 1433, Exhibit 5 to my declaration, and it's Lisa Biggs' handwritten notes of that January 18, 2002, meeting. And in her handwritten notes, the memo that she made to herself, she talks that they're going to get a search warrant to conduct an audit. They want to get to remove the complete documents because the auditing process will be more difficult and time-consuming if they don't. They want, without any time limit or reference to a person or a crime or an event, she lists the documents that they want. That shows up in the search warrant description. Then she says that review of personal credit card statements and personal bank accounts. It is possible reimbursements were made to genesis via personal checks, cut in salary, or purchases made on personal cards for work-related items. That's what she was told in Sacramento. That doesn't show up in the search warrant affidavit. And then she says it will take approximately four to six weeks to conduct an audit covering the past four years. She knew that they only wanted to do a lot of an audit limited to a time frame, but nobody told the magistrate issuing this warrant. And they went back from 1988 all the way up to 2002, seizing every financial document from all of genesis' businesses, not just the ones that they were interested in. And the search warrant, the police are required to insert in the affidavit in favor of the search warrant all matters which go to the innocence of the person being searched? No. I'm saying that under United States v. Cal, that if the officers have probable cause to believe that an entire business is permeated by fraud, they are required to set that forth in the affidavit. If they believe that the documents that they seek cannot be separated from the documents which are legitimate, they are required to set that forth in the affidavit. None of that is in the affidavit. They did not follow this circuit's authority in that regard. Well, you're you seem to be saying that somehow they should have segregated out a subpart of genesis for the search warrant. They knew, yes. They knew that they were only interested in the group home documents. Carroll operated the FAA, and yet they're going into her office. They had a chart that was provided by Gina Vagnino of the office space whose offices were where. They could have only gone after what they wanted to, but they didn't. Well, in mid-December 2001, the FBI referred Genesis, chief operating officer and controller, another person, to the DA's office to address possible wrongdoing at Genesis. Yes. Were Torna and Vagnino working for Genesis? Yes. Gina Vagnino had been there for three weeks, and Torna had been there for about three and a half months. And they came in, and they said there's wrongdoing in Genesis. They had suspicions, but no facts. $460,000 in unexplained expenses and $420,000 in corporate charge expenses for nine months. The $460,000 was later explained in the same interview by Torna as he's saying that they wait to the end of the year to allocate their expenses and that Elaine, Carroll's sister, was doing that as he was speaking. Our CPA, James Braun, pointed out that until the expenses are allocated, it's premature to say that anybody has misappropriated anything. Well, that's true, but this is a probable cause affidavit. It doesn't have to establish conclusively that there's been a crime. True. But Mr. Torna spoke. That's a tape-recorded interview. I provided the transcript to the court. And he told them that I believe page 20 of his transcription that Elaine was using the American Express statements and was doing the allocation as he spoke, as he was speaking to the FBI. Thank you, counsel. Thank you. Good morning, Your Honors. May it please the Court, I'm Jim Arndt, and I represent the appellees, the County of Fresno, and the 30-some-odd individual district attorney office investigator defendants in this case. There are several issues raised in this appeal, and I'd easily go beyond my 10 minutes if I tried to cover them all. I think I'd like to hit some of the highlights and maybe address some of Your Honors' questions with regards to the procedural issues you had at the beginning. You pretty much know from what we asked your adversary what's on our minds.  So it's always helpful to help us on that. Sure. With regards to the Heck v. Humphrey issue, it's not something that you assert as an affirmative defense because the cause of action doesn't even accrue until the conclusion of the criminal case. So I think that's a red herring. The issue with that came to our attention when a motion to suppress the evidence in the criminal case was ruled on in the Fresno County Superior Court several weeks ago. That's what first raised the search warrant issue to our attention, and that's the letter that my office sent to the Ninth Circuit just to bring that change of circumstance to the court's attention. So we didn't sandbag anybody by sitting on it. And you didn't know about the criminal case? Oh, we knew about the criminal case, yes, Your Honor. The search warrant issue only recently came to our attention. But I don't get why that matters. I would have thought you to move to dismiss the appeal and dismiss the underlying case as soon as the indictments came down. And I'll follow my sword, Your Honor. We probably should have done that. But on the other hand, Mr. Quinlan is also representing the criminal defendants in the criminal case, so it's his obligation as well. What raised the issue to my attention was the search warrant issue, and that's why we sent the letter to the court. In terms of the issue of the interlocutory appeal, again, the only interlocutory part of this is the motion to amend to add the two different defendants. It doesn't deal with the search warrant issues that we're here – that we're dealing with this appeal here. With regards to the search warrant, I think a review of the search warrant affidavit, I think it's a 28-page affidavit, establishes a very extensive investigation that was done prior to bringing this warrant to a judge for a signature. They had two confidential informants, confidential at that time. Now we know that they were the chief operations officer and financial officer who initially went to the FBI that then was referred to the Fresno County DA's office, who not only provided background information, but they provided a ton of documentation to back up what they were saying as well. Based on that information, the district attorney's office went and obtained bank records and American Express records through two different search warrants. They went to Sacramento and met with the Department of Social Services to find out what type of documentation they needed, what type of documentation they needed to look for with the search warrant. This is a very complex investigation. They weren't just looking at one issue. They were looking at several areas of criminal activity, the spending nonprofit corporation money that's used for children in group homes on personal items, double billing the county of Fresno for not holding beds open that they should have held open for these children, not returning overpayments made by the county of Fresno to them, and double billing in the foster family portion of it also. So it was an extensive investigation that went on before the search warrant was sought here. In terms of I think a lot of the time in the appellant's brief, they lose sight of the forest for the trees and they focus on what they did not do versus what they did do in terms of their investigation. For example, they say they should have gone and talked to the person in charge of the crisis bed contracts. Well, actually, a supervisor had done that, but that doesn't take away from the probable cause that they had in the warrant. It does nothing to take away from that. It's almost as if they're trying to show that the investigators had to prove that these people had committed crimes. And we're talking about a much lower standard here. We're just talking about probable cause, not proof beyond a reasonable doubt as to whether or not they had committed these crimes. Two other issues that are raised in the warrant are the specificity in terms of the items to be seized. I think there's about an eight-page list of specifically described items that they are searching for. And that list was provided by the Department of Social Services. These are the items you need to look for in doing this investigation. And several of the categories are broken down into subcategories, but it's a very specific, very defined list. In terms of the timeframe, there were timeframes mentioned in the affidavit. Again, this is a complex white-collar investigation involving transactions occurring over a period of years. They basically, based on the totality of circumstances they had, they did their best with the timeframe, and they put that in the affidavit. But again, it's a very complex investigation, and they pretty much did their best with what they had. And that's what the law requires. Before you run out of time, let's talk about the interlocutory appeal. It seems that there was a mistake. The district court made a mistake. The suit was filed in December of 2002, and in January 2003, the statute of limitations was extended to two years. That happened before the one-year statute had run. So under California authority, she gets the benefit of the two-year statute. So it appears to me the district court's reasoning was wrong. Correct. And we did not file an answering brief, Your Honor. I don't think I've ever said this, but I think the appellants are right in this case. Okay. I just wanted to confirm that. Thank you. And unless there are any other questions, I'll submit it, Your Honors. Thank you, counsel. Thank you. I can't remember. I think we went over time on yours and a long time. There wasn't that much to rebut. So unless my colleagues wish, we'll submit this case now. Fine by me. Delatore v. County of Fresno is submitted. Thank you, Your Honor. We'll hear of Lamberth v. Canberra. Thank you. Thank you.
judges: Ferguson, Trott, Kleinfeld